Opinion issued November 3, 2022



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00031-CV

————————————

**TURNER SPECIALTY SERVICES, LLC, Appellant**

**V.**

**MICHAELA HORN, INDIVIDUALLY AND AS NEXT FRIEND OF G.H. AND M.M., MINORS, AND ATRELLE HORN, Appellees**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-42026**

---

## MEMORANDUM OPINION

Justin Horn died while performing his job for his employer appellant Turner Specialty Services, LLC (Turner Specialty). Appellees Michaela Horn, both in her individual capacity as Justin's spouse and as next fried of their two minor children, along with Justin's mother, Atrelle Horn, (collectively, the Horns), sued Turner

Specialty and four other defendants.[1] Among their claims, the Horns asserted that Justin died as a result of Turner Specialty's gross negligence.

Turner Specialty filed a special appearance, asserting that the trial court had neither general nor specific jurisdiction over it. The trial court signed an order denying the special appearance, and Turner Specialty appealed.[2] Because the record demonstrates that Turner Specialty has sufficient minimum contacts with Texas, we conclude that the trial court has specific jurisdiction, and we affirm the order.

## Background

Turner Specialty is a Louisiana limited liability company headquartered in Baton Rouge, Louisiana. It provides turnaround maintenance services at refineries and petrochemical facilities in states along the Gulf of Mexico, including Alabama, Mississippi, Louisiana, and Texas. In 2019, around 20 percent of Turner Specialty's revenue was attributable to Texas projects. Turner Specialty has one office in Texas, but its parent company, Turner Industries, has additional offices in Texas, which Turner Specialty utilizes for certain purposes. For instance, Turner Specialty uses the personnel offices of Turner Industries in Texas for hiring and onboarding its

---

[1]     The other defendants are not parties to this interlocutory appeal.

[2]     *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (authorizing interlocutory appeal of order granting or denying special appearance).

2

employees. In July 2020, Turner Specialty had 1,270 employees, with 157 of those employees working in Texas.

Turner Specialty contracted with Hunt Refining Company to provide catalyst work at Hunt's refinery in Tuscaloosa, Alabama. Catalyst work involves working in enclosed spaces, such as large tanks and reactors, in an inert atmosphere lacking oxygen. Because of the lack of oxygen, catalyst workers wear air supply equipment, including a helmet, while working. The catalyst work at the Hunt Refinery involved cleaning the inside of large tanks or reactors in an inert atmosphere.

Catalyst workers are specialized workers who are in limited supply in the United States. In March 2019, Turner Specialty was seeking catalyst workers for the work at the Hunt Refinery. At that time, Justin, a Texas resident, was a catalyst worker employed by a Texas company, Cat-Spec, Ltd.—a catalyst service provider and competitor of Turner Specialty.

Turner Specialty employee Jesse Faught knew Justin. On March 5, 2019, Faught texted Justin to determine whether Justin was interested in working for Turner Specialty at the Hunt Refinery. Justin indicated that he was interested, and Faught gave Justin's contact information to Turner Specialty employee John Ellis. Ellis texted Justin and then spoke with him on phone about the job. Ellis explained that the catalyst work at the Hunt Refinery would last only 30 days but told Justin that he would use him for other jobs if he could. Turner Specialty offered Justin more

money than he was making at Cat-Spec, and he accepted the job offer. At the time of the communications, Justin was in Texas and Faught and Ellis were in Louisiana.

Turner Specialty pays Turner Industries to use Turner Industries' personnel office located in Beaumont, Texas. After Justin accepted the job offer, Turner Specialty directed Justin to go to the Beaumont personnel office on March 14, 2019. There, Justin filled out pre-employment paperwork, underwent drug testing and a physical examination, and received online safety training from Turner Specialty on which he was tested. Ten of the fifteen members of the catalyst crew on which Justin later worked at the Hunt Refinery also were Texas residents who received their initial safety training from Turner Specialty in Texas.

Turner Specialty transported Justin and other employees from Texas to the Hunt Refinery in Alabama, where Justin started work on March 16, 2019. Once there, Justin and other members of the catalyst crew received additional training. That training related to the catalyst work. More specifically, the training covered working in confined spaces; concerned how to use air supply equipment, including a helmet, in an inert atmosphere; and involved emergency rescue procedures.

To perform the catalyst work, Turner Specialty supplied Justin and the catalyst crew with air supply equipment, including helmets, that it had purchased from Edelhoff Technologies, U.S.A., LLC—a Texas limited liability company based in Texas. Turner Specialty had an agreement with Edelhoff to maintain and repair

4

the equipment and to train Turner Specialty's employees on the equipment's use and maintenance.

Turner Specialty had purchased four helmets from Edelhoff in December 2015. One of those helmets was Helmet 29. In August 2016, Turner Specialty contacted Edelhoff, notifying it that Helmet 29 needed repair due to a broken screw. Turner Specialty sent Helmet 29 to Edelhoff in Texas where a repair was made. Edelhoff then sent it back to Turner Specialty.

On March 26, 2019, Justin died while performing catalyst work at the Hunt Refinery. At the time, he was working in an inert atmosphere and wearing air supply equipment purchased from Edelhoff, including Helmet 29.

On July 15, 2020, Justin's wife, Michaela, individually and as next friend of their two minor children, filed a wrongful death suit. Michaela sued Edelhoff, asserting products-liability and negligence claims, and she sued premises owner, Hunt, for negligence. She also sued Justin's employer, Turner Specialty. Because Turner Specialty subscribed to Texas workers' compensation insurance, which paid death benefits to the Horn family, Michaela asserted only a gross negligence claim against Turner Specialty in the suit. *See* TEX. LAB. CODE. § 408.001(a)–(b) (providing that, except for instances of intentional acts or gross negligence, recovery of workers' compensation benefits is "the exclusive remedy" for worker's legal beneficiaries against worker's employer for employee's death). Later, Justin's

mother, Atrelle, was added as a plaintiff, and two defendants were also added: (1) Turner Specialty's parent company, Turner Industries, which was sued for negligence, and (2) another company, which had also supplied equipment, including alarms and sensors, for the catalyst work.

In their live pleading, the Horns claimed that, "[a]t the time of his death, Justin Horn worked for Defendant Turner Specialty Services, LLC and/or Turner Industries Group, L.L.C." The Horns alleged that, when he died, Justin was wearing an "Air Supply System" manufactured by Edelhoff that "was owned and/or in the control of Turner Specialty Services, LLC and/or Turner Industries Group, L.L.C. and/or Hunt." They asserted, "Suddenly, and without warning to Justin Horn, the Air Supply System malfunctioned, depriving him of oxygen" and that, "[a]s a result, Justin Horn subsequently suffocated and died."

The Horns premised their strict products liability claim against Edelhoff on allegations that "the Air Supply System was defective and in an unreasonably dangerous condition" when Edelhoff sold it to Turner Specialty. Alternatively, they claimed that Edelhoff had "altered or modified the Air Supply System, rendering it defective and unreasonably dangerous." The Horns also asserted that Edelhoff was negligent because it had not properly maintained the air supply equipment and had not properly trained "employees responsible for inspections and maintenance" of the equipment.

6

The Horns' negligence claims against Turner Industries were based in part on allegations that it had failed to properly train its employees. In making the gross negligence claim against Turner Specialty, the Horns generally alleged that Turner Specialty's "acts and omissions when viewed from the standpoint of [Turner Specialty], involved an extreme degree of risk, considering the probability and magnitude of the potential harm to [the Horns]."

Turner Specialty and Turner Industries filed separate special appearances. Each asserted that the trial court lacked general or specific personal jurisdiction. Relevant to specific jurisdiction, Turner Industries challenged the Horns' allegation that it had been "doing business" in Texas because it had "committed a tort in the State of Texas at facilities it owns, and/or leases, and operates, including at its leased facility in Beaumont, Texas." Specifically, the Horns alleged that Turner Industries had "negligently trained, hired, and/or retained Texas residents who formed the crew conducting catalyst work that Justin Horn was doing on the date of the incident" and that the "negligent training, hiring, and/or retention of Texas resident workers contributed to Justin Horn's death."

Turner Industries asserted that the Horns' allegations that it had "negligently trained, hired, and/or retained Texas residents who formed the crew conducting the Catalyst work Justin Horn was doing on the date of the incident" were false because Turner Industries had not employed or trained Justin or the catalyst crew. Turner

Industries offered the affidavit of Gerald Braud, an executive vice president of both Turner Industries and Turner Specialty.

Braud testified that, while Turner Specialty was a subsidiary of Turner Industries, they were separate companies. He also testified that the catalyst work at the Hunt Refinery was provided by Turner Specialty, not Turner Industries, pursuant to a contract between Hunt and Turner Specialty. Braud averred that Turner Industries "did not recruit, train, or employ Justin Horn or any other member of the Catalyst crew that was performing the Catalyst work at the Hunt Refinery." Rather, "[t]he Catalyst crew, including Justin Horn, were employees of [Turner Specialty]." Turner Industries also asserted that it was not subject to general personal jurisdiction in Texas because it was not "essentially at home" in Texas, as required for general jurisdiction.

To support jurisdiction over Turner Specialty, the Horns alleged in their live pleading that Turner Specialty had "conduct[ed] a substantial amount of business in Texas." They also alleged that Turner Specialty had recruited Justin, a Texas resident, to perform the catalyst work at Hunt Refinery and that Turner Specialty had entered into an oral employment contract with Justin to be performed in Texas. They further alleged that Turner Specialty had a contract with Edelhoff for the purchase, maintenance, and repair of the air supply equipment in Texas.

8

In its special appearance, Turner Specialty acknowledged that it, not Turner Industries, had hired and employed Justin. Turner Specialty also acknowledged that it had contacted Justin to work on the Hunt Refinery job because he possessed the specialized skills necessary to do the catalyst work, but Turner Specialty denied that it knew that Justin was in Texas or a Texas resident at the time its representatives contacted him, and it denied that it had entered into an oral contract with Justin. Turner Specialty further asserted that the Horns' claim against Turner Specialty did not arise out of or relate to its business dealings with Edelhoff.

Turner Specialty also acknowledged that it had provided safety training in Texas to Justin and to other members of the catalyst crew who were Texas residents. But it minimized the importance of the Texas safety training:

> Any attempt by [the Horns] to establish personal jurisdiction over [Turner Specialty] with allegations of training in Texas, i.e., that [Turner Specialty's] failures to train, or failure to properly train Justin Horn occurred in Texas, and such failures caused or contributed to the alleged Alabama-incident, also fail to establish personal jurisdiction over [Turner Specialty].

Turner Specialty offered the affidavit of James Watkins, its vice president. Regarding the training, Watkins testified that "Justin Horn traveled to Tuscaloosa, Alabama, arriving on or about March 15, 2019 and began safety training specific to the job as described below in Alabama on or about March 16, 2019 at [Hunt's] facility with the majority of the other members of his Catalyst crew." Watkins continued,

9

The only training received in Texas by Justin Horn and the Texas residents hired by [Turner Specialty] who worked on Justin Horn's Catalyst crew was basic Safety and Health[] Orientation ("SHO") training when they were initially hired. The SHO training involved on-line training with regard to general safety principles, not safety training specific to inert atmosphere work as further described herein. All other training including the training relevant to the Catalyst work at the Hunt Refinery was provided by [Turner Specialty] to Justin Horn and Horn's Catalyst crew outside the State of Texas. This training included confined space, confined space attendant, helmet user qualification, fresh air supply, and rescue. Confined space training involves training to work in enclosed tanks, vessels or other confined spaces. Confined space attendant training concerns training for personnel who monitor the access to and assist entrants into the confined space. Helmet user qualification and fresh air supply training pertains to training regarding the helmet and air supply equipment for use in the inert atmosphere inside the confined spaces. Rescue training involves training concerning what to do in case of an emergency.

Turner Specialty labeled Justin's safety training in Texas as "fortuitous." It cited Watkins's testimony indicating that newly hired Turner Specialty employees underwent the onboarding process at whatever personnel office was the most convenient for them. Thus, if a new hire, like Justin, lived in Texas, he would be onboarded in the nearest Texas personnel office rather than being required to travel to Turner Specialty's personnel office in Louisiana.

Turner Specialty also contended that its contacts with Texas, including the training that it provided to Justin in Texas, were not substantially connected to the litigation. It asserted that "the incident from which Plaintiffs' claims arise occurred in Alabama, and therefore, the operative facts of this litigation from which the claim arose—or TSS' actionable conduct—occurred in and concern Alabama." Turner

Specialty claimed that the safety training that Justin received in Texas "[did] not relate to the operative facts of the incident made basis of this lawsuit, nor would they satisfy the requisite 'substantial connection' between the operative facts and the forum." It asserted that the catalyst training, which occurred in Alabama, was the training that had a "substantial connection to the operative facts of the litigation."

Turner Specialty also asserted that, while it conducted business in Texas, it was not subject to general jurisdiction because it did not have sufficient systematic and continuous contacts to render it "at home" in Texas.

In their special-appearance response, the Horns claimed that the trial court had general and specific jurisdiction over Turner Specialty. Addressing specific jurisdiction, they asserted, inter alia, that the safety training provided in Texas by Turner Specialty to Justin and to 10 of the 15 members of the catalyst crew supported the trial court's specific personal jurisdiction over Turner Specialty. The Horns offered Turner Specialty's discovery responses, which confirmed that Justin and 10 members of the catalyst crew had received safety training in Texas and that Justin had received the safety training in Texas 12 days before his death. The Horns' evidence included a 29-page printout reflecting that, in conjunction with the Texas safety training, Justin had completed an eight-module safety test at the Beaumont office.

11

Following a non-evidentiary hearing, the trial court granted Turner Industries' special appearance but denied that of Turner Specialty. Turner Specialty now appeals the denial of its special appearance.[3]

## Personal Jurisdiction

In one issue, Turner Specialty contends that the trial court erred by denying its special appearance.

### A. Standard of Review

As a question of law, we review de novo whether a trial court has personal jurisdiction over a nonresident defendant. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). Resolving this question of law, though, may require a court to decide questions of fact. *Id.* When, as here, the court does not issue findings of fact for its special-appearance decision, we presume that all fact disputes were resolved in favor of the decision and imply all relevant facts necessary to support the judgment that are supported by the evidence, unless they are challenged on appeal. *See id.*; *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017).

### B. Applicable Legal Principles

"Texas courts may assert *in personam* jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise

---

[3] The Horns did not appeal the order granting Turner Industries' special appearance.

12

of jurisdiction is consistent with federal and state due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). The Texas long-arm statute permits personal jurisdiction over a nonresident doing "business in this state." TEX. CIV. PRAC. & REM. CODE § 17.042. The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. *Id.* However, these listed activities are non-exclusive. *See id.* (stating that listed activities are "[i]n addition to other acts that may constitute doing business" in Texas); *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 n.9 (Tex. 2010) (noting list is non-exclusive). "[T]he long-arm statute's broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 (internal quotation marks omitted). Thus, when "doing business" is alleged as a ground for personal jurisdiction, "we only analyze whether [the nonresident defendant's] acts would bring [it] within Texas' jurisdiction consistent with constitutional due process requirements." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

To satisfy due-process requirements, personal jurisdiction may be exercised over a nonresident defendant only if two requirements are met: (1) the defendant has

"minimum contacts" with the forum state and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Luciano*, 625 S.W.3d at 8; *Moki Mac*, 221 S.W.3d at 575. A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state. *Retamco Operating, Inc.*, 278 S.W.3d at 338. Purposeful availment is the touchstone of the jurisdictional due-process analysis. *Luciano*, 625 S.W.3d at 9. "There must be 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The Supreme Court of Texas has identified three distinct aspects of the "purposeful availment" requirement. First, only the defendant's contacts with the forum are relevant because a nonresident should not be called into court in a jurisdiction solely as a result of the unilateral activity of another party or third person. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). Second, the defendant's acts must be purposeful, as opposed to random, isolated, or fortuitous. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.*

A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *Moki Mac*, 221 S.W.3d at 575–76. As discussed below, here, we focus

14

on specific jurisdiction. To constitute the minimum contacts required for a Texas court to exercise specific jurisdiction over a nonresident defendant, the defendant's contacts with Texas (1) must be purposeful, as discussed above, and (2) the cause of action must "arise from or relate to" those forum contacts. *Id.*

A trial court determines a special appearance "on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3); *see Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden."). On appeal, the scope of our review of a ruling on a special appearance includes all the evidence in the record. *PetroSaudi Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 132 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly*, 301 S.W.3d at 658. Once met, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.* Here, even aside from their allegations that Turner Specialty entered into contracts with Texas residents to be performed in Texas and recruited Justin, a Texas resident, to work for Turner

Specialty, the Horns' allegation that Turner Specialty had "conduct[ed] a substantial amount of business in Texas" alone was sufficient to meet the minimal pleading requirement to satisfy the long-arm statute. *See Devon Energy Corp. v. Moreno*, No. 01-21-00084-CV, 2022 WL 547641, at \*5 (Tex. App.—Houston [1st Dist.] Feb. 24, 2022, no pet.) (mem. op.) (holding that allegation that defendant did "a substantial amount of business in Harris County, Texas" satisfied initial, minimal pleading requirement). Thus, Turner Specialty had the burden to present evidence negating the Horns' alleged bases for personal jurisdiction. *See Kelly*, 301 S.W.3d at 658.

## C.    Analysis

Although the Horns cite a number of contacts with Texas to support their assertion that the trial court has specific jurisdiction over Turner Specialty, we conclude that Turner Specialty's conduct of providing safety training to Justin and his crewmates in Texas sufficiently supports specific jurisdiction. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013) (recognizing that single contact with Texas may support jurisdiction); *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 282 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (focusing on one of "many different contacts" nonresident defendant had with Texas to hold that defendant was subject to specific personal jurisdiction). As discussed, the jurisdictional evidence showed that Turner Specialty provided Justin online safety training at the Beaumont personnel office 12 days before his death. In

16

conjunction with the training, Justin completed an eight-module safety test. And the evidence showed that two-thirds of Justin's crewmates received safety training in Texas. As acknowledged by Turner Specialty in its special appearance, the Horns raised lack of proper training by Turner Specialty as conduct "caus[ing] or contribut[ing] to the alleged Alabama-incident" involving Justin's death.

We begin by determining whether the Texas safety training constituted purposeful availment. *See Moki Mac*, 221 S.W.3d at 576. As noted, the purposeful availment analysis considers not only the conduct of the defendant, as opposed to the plaintiff or a third party, but also considers whether those contacts were random or fortuitous and whether the defendant benefitted from those contacts. *See Michiana*, 168 S.W.3d at 785. In its brief, Turner Specialty characterizes its conduct of providing safety training to Justin in Texas as fortuitous. We disagree.

Here, Turner Specialty's representatives, Jesse Faught and John Ellis, initiated contact with Justin seeking his in-demand skills as a catalyst worker. The jurisdictional evidence—specifically, Ellis's deposition testimony offered in support of the special appearance—showed that Ellis "directed" Justin to the Beaumont personnel office to complete the onboarding process, which included the safety training. Ellis qualified his testimony by stating that he directed Justin to the Beaumont office because it was a more convenient location for Justin than Turner Specialty's Louisiana office. But the evidence showed that sending Justin to the

17

Beaumont office was not an anomaly or specific to Justin. Watkins testified in his affidavit that Turner Specialty paid Turner Industries to use the Beaumont personnel office to onboard Texas residents that it hired. Dwight Braud, an executive vice president for Turner Industries and Turner Specialty, characterized the Beaumont office as "a shared personnel office" between Turner Specialty and Turner Industries. And, as noted, 10 other Turner Specialty employees on Justin's catalyst crew also received initial safety training from Turner Specialty in Texas.

In short, the evidence showed that Turner Specialty directed Justin to complete the onboarding process, including the safety training, at their Beaumont personnel office. No evidence showed that the decision regarding where Justin would receive the safety training was made or initiated by him. *Cf. id.* at 787. Nor does the evidence show that the location of where Justin received the safety training was random or fortuitous. Turner Specialty paid Turner Industries to share the Beaumont personnel office for purposes of onboarding and training Texas residents that it hired. Had Turner Specialty wanted to avoid jurisdiction in Texas it could have required Justin to complete the safety training outside of Texas. *See id.* at 785 ("[A] a nonresident may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction."). The trial court also could have reasonably inferred that Turner Specialty benefited from providing the safety training to Justin in Texas. By

onboarding and training employees in a location more convenient for them, it is reasonable to infer that Turner Specialty incentivized Texas residents to work for Turner Specialty. And, by doing so, Turner Specialty acquired workers, like Justin, who had skills that were in limited supply. For these reasons, we conclude that, by conducting safety training as part of the onboarding process in Texas, Turner Specialty purposefully availed itself of the privilege of conducting activities in Texas. *See id.*

But "purposeful availment alone will not support an exercise of specific jurisdiction." *Moki Mac*, 221 S.W.3d at 579. The defendant's liability must also arise from or relate to the purposeful forum contacts. *Id.* "This so-called relatedness inquiry defines the appropriate 'nexus between the nonresident defendant, the litigation, and the forum.'" *Luciano*, 625 S.W.3d at 14 (quoting *Moki Mac*, 221 S.W.3d at 579).

In *Moki Mac*, the Supreme Court of Texas held that, for a cause of action to arise from or relate to purposeful forum contacts, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. Since then, the United States Supreme Court in *Ford Motor Company v. Montana Eighth Judicial District Court* clarified that specific jurisdiction does not "always require[e] proof of causation—i.e., proof that the plaintiff's claim came

about because of the defendant's in-state conduct" because "some relationships will support jurisdiction without a causal showing." 141 S. Ct. 1017, 1026 (2021).

The Court explained,

> None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum. The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing.

*Id.* (internal citation omitted).

The Supreme Court cautioned, however, "[t]hat does not mean anything goes" because the phrase "'relate to' incorporates real limits" to adequately protect nonresident defendants. *Id.* There must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place" in the forum. *Id.* at 1031 (quoting *Bristol-Myers Squibb Co. v. Superior Court. of Cal.*, 137 S. Ct. 1773, 1776 (2017)).

In *Luciano*, the Supreme Court of Texas declined to determine whether, after *Ford*, its "substantial connection" standard found in *Moki Mac* "exceed[ed] the bounds of due process." 625 S.W.3d at 16 n.5. The court explained that it need not make that determination because its holding "rest[ed] on the Supreme Court's analysis in *Ford Motor Co.*—a case whose factual circumstances resemble[d] those

20

[in *Luciano*]—to determine whether a product liability lawsuit 'arise[s] out of or relate[s] to' a nonresident defendant's contacts with the forum state." *Id.*

After *Ford* and *Luciano*, this Court recognized that the relatedness inquiry "does not require a strict causal relationship between the defendant's in-state activity and the litigation" but also recognized that it "requires that there be a connection between the nonresident defendant's purposeful contacts in Texas and the plaintiff's suit." *Weeks Marine, Inc. v. Carlos*, No. 01-21-00015-CV, 2021 WL 4897714, at *3 (Tex. App.—Houston [1st Dist.] Oct. 21, 2021, pet. filed) (mem. op.) (citing *Luciano*, 625 S.W.3d at 14). In *Ford*, the Supreme Court upheld specific jurisdiction against the defendant, Ford, because there was "a strong relationship among the defendant, the forum, and the litigation," citing that tripartite connection as being "the essential foundation of specific jurisdiction." 141 S. Ct. at 1028 (internal quotation marks omitted). Thus, in determining whether the suit arises out of relates to a defendant's contacts with the forum, we focus on the connection between the litigation, the defendant, and the forum. *See id.*; *Moki Mac*, 221 S.W.3d at 584–85. And, in making this determination, we are mindful that the relatedness inquiry does not require a strict causal relationship between the defendant's in-state activity and the litigation. *See Luciano*, 625 S.W.3d at 14 (citing *Ford Motor Co.*, 141 S. Ct. at 1026).

Here, the issue of whether Turner Specialty's failure to properly train Justin and his crewmates caused or contributed to his death is an operative fact of the Horns' gross negligence claim against Turner Specialty, and the safety training that Turner Specialty provided to Justin and his crewmates in Texas is directly related to that claim. *See Nogle*, 290 S.W.3d at 284 (holding that nonresident defendant's contract with Texas-based engineer to design inspection procedure for wing spar supported specific jurisdiction when plaintiffs asserted negligence in design and inspection of wing spar). Thus, the direct relationship between Turner Specialty's in-state conduct and the complained-of liability—that is, the relationship among the defendant, the forum, and the litigation—are sufficiently close to support specific jurisdiction over Turner Specialty. *See Ford Motor Co.*, 141 S. Ct. at 1032; *Moki Mac*, 221 S.W.3d at 575–76.

Turner Specialty argues that the Texas safety training does not have a strong enough relationship or substantial connection to the gross negligence claim because the incident occurred in Alabama, not in Texas. In support of this proposition, Turner Specialty cites *Moki Mac*. There, the Supreme Court of Texas determined that there was no specific jurisdiction over Moki Mac, a Utah-based tour company, sued in Texas for wrongful death by the parents of a teenager who died in Arizona while hiking with Moki Mac. *Id.* at 573, 585. Like here, the decedent died outside the Texas forum, but unlike here, there were no allegations of negligent conduct by the

22

non-resident defendant in Texas that led to his death. *See id.* at 573. The only connection Moki Mac had to Texas was sending an advertising brochure and a release to Texas, which the parents alleged contained misrepresentations on which they relied. *See id.*

Unlike the Texas-based misrepresentations in *Moki Mac*, which were tangential to the plaintiffs' core negligence claim, here, Turner Specialty's alleged Texas-based conduct in providing improper safety training is an alleged basis for Turner Specialty's liability. *See Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 167 (Tex. App.—Fort Worth 2008, no pet.) (distinguishing *Moki Mac* on ground that Texas misrepresentations, there, were "tangential to the plaintiffs' core negligence claim," whereas alleged Texas misrepresentations in *Glencoe* constituted operative facts of plaintiff's claims). As noted, we are mindful that the relatedness inquiry does not require a strict causal relationship between the defendant's in-state activity and the litigation, but, here, the Horns allege that the improper training, at least in part, caused or contributed to Justin's death. Thus, Turner Specialty's liability, if any, arises directly from and relates to the Texas safety training.

Turner Specialty also points to the principle of "interstate federalism" to challenge jurisdiction. In *Ford*, the Supreme Court recognized that the rules comprising the minimum-contacts requirement "reflect two sets of values—treating

23

defendants fairly and protecting 'interstate federalism.'" 141 S. Ct. at 1025. Interstate federalism is "the component of federalism doctrine that concerns the relative powers of the several States." *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021) (citing *Ford*, 141 S. Ct. at 1025). "[P]rinciples of interstate federalism, which recognize that '[t]he sovereignty of each State implies a limitation on the sovereignty of all its sister States,' protect defendants from 'the coercive power of a State that may have little legitimate interest in the claims in question.'" *Id.* (quoting *Bristol-Myers Squibb*, 137 S. Ct. at 1780–81).

In *Ford*, the Supreme Court held that the principles of interstate federalism were served, in each of the two underlying products-liability suits, by subjecting Ford to personal jurisdiction in Montana and Minnesota, respectively, in suits filed by resident plaintiffs whose defective Ford vehicles had crashed and caused injuries in those states. 141 S. Ct. at 1023. The Court rejected Ford's argument offered to support personal jurisdiction in Washington and North Dakota where each vehicle had been purchased by its original owner many years earlier but otherwise had no other connection with the suits. *Id.* at 1030–32. The Court noted that, in each of those two states, the suit would "involve[] all out-of-state parties, an out-of-state accident, and out-of-state injuries," resulting in "a less significant relationship among the defendant, the forum, and the litigation'" *Id.* at 1030 (internal quotation marks omitted). The Court noted that "each of the plaintiffs [had] brought suit in the most

24

natural State"—Montana and Minnesota—where the plaintiffs resided and where the injuries incurred. *Id.* at 1031.

Here, Turner Specialty asserts that "the most natural State" for the instant suit is Alabama because that is where the incident occurred—thereby equating Alabama in this case with Montana and Minnesota in *Ford* and equating Texas with Washington and North Dakota. But that comparison is not apt. Justin was not a resident of Alabama but a resident of Texas. Justin had only been in Alabama for 10 days when he died performing a job for which he had been recruited, hired, and partly trained in Texas. In short, the facts here are not as clear-cut with respect to an interstate federalism analysis as they were in *Ford*. Nevertheless, we are mindful that, in *Ford*, the Court explained that the principles of interstate federalism supported jurisdiction in Montana and Minnesota because each state had significant interests in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors" and in "enforcing their own safety regulations." *Id.* at 1030 (brackets in original; internal quotation marks omitted). Likewise, Texas has an interest in providing a convenient forum for its residents, when, as here, the resident was recruited, hired, and trained in Texas by an out-of-state actor who then transported the resident to another state to perform a short-term job in a potentially lethal environment. For these reasons, we conclude that the principles of interstate federalism do not tip the scale in favor of Alabama.

25

Turner Specialty also contends that its "actionable conduct that is substantially related to the operative facts of this litigation concerns the training and supervision of the air supply equipment that [Turner Specialty] provided to the Catalyst crew in Tuscaloosa, Alabama," not its Texas conduct. Undeniably, the Horns have alleged conduct by Turner Specialty in Alabama to support their liability claim. "But the contacts an entity forms with one jurisdiction do not negate its purposeful contacts with another." *Luciano*, 625 S.W.3d at 10. In other words, just because Turner Specialty could be subject to personal jurisdiction in Alabama does not mean that it cannot be subject to jurisdiction in Texas. *See id.*

Turner Specialty further asserts that, of the training that Justin and his crewmates received, only the training in Alabama is important to the jurisdictional analysis. It cites Watkins's affidavit in which he testified that the Alabama training pertained to the catalyst work whereas the Texas training covered "general safety principles, not safety training specific to inert atmosphere work." Turner Specialty contends, "[T]here is no evidence that any training in Texas, directly or even tangentially, relates to the circumstances surrounding the incident. Rather, it is much more likely that the Catalyst training provided in Alabama, to the extent relevant at all, could be 'at issue.'" However, whether the Texas safety training caused or contributed to Justin's death presents "merits-based questions that should not be resolved in a special appearance." *Nogle*, 290 S.W.3d at 284; *see Moki Mac*, 221

26

S.W.3d at 583 (declining to adopt jurisdiction rule that "would require a court to delve into the merits to determine whether a jurisdictional fact is actually a legal cause of the injury"); *Michiana*, 168 S.W.3d at 791 (stating special appearance involves consideration of only jurisdiction, not merits or liability).

For the reasons discussed, we conclude that Turner Specialty purposely availed itself of conducting activities in Texas and that the Horns' gross negligence claim arises from or relates to those activities. We hold that the allegations and the evidence establish that Turner Specialty had sufficient minimum contacts with Texas to be subject to specific personal jurisdiction.[4] We further hold that the trial court did not err when it denied Turner Specialty's special appearance. Thus, we overrule Turner Specialty's sole issue.[5]

---

[4] On appeal, Turner Specialty does not argue that the trial court's exercise of personal jurisdiction over it would offend traditional notions of fair play and substantial justice—the second prong in the jurisdictional analysis. Thus, we do not address that aspect of personal jurisdiction. *See Lucas v. Ryan*, No. 02-18-00053-CV, 2019 WL 2635561, at *10 (Tex. App.—Fort Worth. June 27, 2019, no pet.) (mem. op.) (citing TEX. R. APP. P. 38.1(f), (i)); *Twyman v. Twyman*, No. 01-08-00888-CV, 2009 WL 1331341, at *7 (Tex. App.—Houston [1st Dist.] May 14, 2009, no pet.) (mem. op.); *Bos. Med. Grp., Inc. v. Ellis*, No. 14-06-00801-CV, 2007 WL 2447360, at *3 n.1 (Tex. App.—Houston [14th Dist.] Aug. 30, 2007) (mem. op.).

[5] Because our holding that Texas has specific personal jurisdiction over Turner Specialty is dispositive, we need not address Turner Specialty's challenge to general jurisdiction. *See* TEX. R. APP. 47.1.

## Conclusion

We affirm the trial court's order denying Turner Specialty's special appearance.

Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.